# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 6376 | **DATE** | 8/29/2003 |
| **CASE TITLE** | The Chamberlain Group vs. Skylink Technologies, Inc. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion And Order. Plaintiff's motion for summary judgment on Count III (Doc. No. 29-1) is denied.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | 6 number of notices | **Document Number** |
|---|---|---|---|---|
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | SEP 0 3 2003 date docketed | |
| | Notified counsel by telephone. | | | 141 |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | 8/29/2003 | |
| ✓ | Copy to judge/magistrate judge. | | date mailed notice | |
| ETV | courtroom deputy's initials | | ETV mailing deputy initials | |

U.S. DISTRICT COURT CLERK
03 AUG 29 PM 4:47
Date/time received in central Clerk's Office

THE CHAMBERLAIN GROUP, INC., a )
Connecticut corporation, )
                 )
            Plaintiff, )
                 )
           v. )     No. 02 C 6376
                 )
SKYLINK TECHNOLOGIES, INC., a )     Judge Rebecca R. Pallmeyer
corporation, )
                 )
           Defendant. )

**DOCKETED**

**SEP 0 3 2003**

## MEMORANDUM OPINION AND ORDER

On March 26, 2003, Plaintiff The Chamberlain Group ("Chamberlain") filed its second amended complaint (SAC) against Defendant Skylink Technologies ("Skylink"), Plaintiff's competitor in the electronic garage door industry.[1] In this lawsuit, Chamberlain challenges Skylink's distribution of a universal remote transmitter capable of activating certain garage door openers manufactured and sold by Chamberlain. In its SAC, Chamberlain invokes the Digital Millennium Copyright Act ("DMCA" or "the Act"), 17 U.S.C. §1201 *et seq.*; the Lanham Act, 15 U.S.C. § 1125; the Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2; and the Uniform Deceptive Trade Practices Act, 805 ILCS 510/2. In addition, Plaintiff raises claims of patent infringement and claims that Skylink's actions constitute unfair competition under Illinois common law.

For the purposes of this opinion, the court is only concerned with Count III of Chamberlain's

---

[1]     On May 9, 2003, Chamberlain filed a "Motion for Leave to File Third Amended Complaint" to add two new defendants to this litigation: Capital Prospect Limited and Philip Tsui. (Chamberlain's Motion for Leave to File Third Amended Complaint, (hereinafter, "Plf.'s Motion for Leave"), at 1.) The court has continued its ruling on this motion until after the court has ruled on Plaintiff's motion for summary judgment on its DMCA claim. (*See Chamberlain Group v. Skylink Technologies, Inc.*, 02 C 6376, Minute Order of July 10, 2003.) According to Chamberlain, Capital Prospect Limited is a foreign corporation with its principal place of business in Hong Kong, and Philip Tsui is the Chief Executive Officer of Skylink. (Plf.'s Motion for Leave, at 2-3.)

*141*

complaint, in which Plaintiff alleges that Skylink violated the DMCA by manufacturing and marketing a transmitter that is capable of operating Chamberlain's "Security+" garage door opener system. According to Chamberlain, the Skylink transmitter is capable of operating the Chamberlain garage door opener because the transmitter unlawfully circumvents a technological protective measure in Chamberlain's garage door opener's computer program. Specifically, Chamberlain claims that Skylink violated the DMCA by developing a product: (1) for the purpose of circumventing the protective measure included in Chamberlain's computer program; (2) that has no commercially significant purpose other than to circumvent Chamberlain's technological measure; and (3) that Skylink markets for the purpose of circumventing Chamberlain's protective measure. On December 3, 2002, Chamberlain filed a motion for summary judgment on Count III. Skylink opposes this motion, arguing (1) that disputed issues of material fact exist; (2) that the DMCA does not protect Chamberlain's garage door opener; and (3) that Skylink fits within a safe harbor provision of the DMCA. For the reasons stated in this opinion, Chamberlain's motion is denied.

## BACKGROUND[2]

Plaintiff Chamberlain is a Connecticut corporation with its principal place of business in

---

[2]     The court compiled the facts for this section from the parties' Local Rule 56.1(a)(3) and (b)(3) Statements of Material Facts and attached exhibits. As described below, these statements reflect a number of factual disputes. Defendant has raised evidentiary objections to the declarations of James J. Fitzgibbon and Richard Allan Gregory, which were both filed in support of Chamberlain's motion, (Def.'s Evidentiary Objections, at 1), but because the court has denied the Plaintiff's motion for summary judgment, these objections are moot. The court notes, further, that Plaintiff has objected to a number of the factual assertions in Defendant's 56.1(b)(3) Statement of Material Facts on the basis that these statements are immaterial to Plaintiff's motion. To the extent the court addresses these facts in this decision, the court finds these facts material and overrules Plaintiff's objections; to the extent the challenged facts are not addressed here, Plaintiff's objections are moot. Lastly, the court notes that both parties have included a number of documents in the record that are not discussed by the court in this background section. For instance, Chamberlain has presented marketing materials from a variety of garage door opener brands and United States Patents Nos. 5,517,187, 6,154,544, 6,441,719, 6,377,173, 6,191,701, and 6,366,198. Skylink has included a copy of Judge Conlon's decision in *Chamberlain Group v. Interlogix, Inc.*, No. 01 C 6157, 2002 WL 1263984 (N.D. Ill. June 3, 2002). Although the court has reviewed the entire record, only that information relevant to the resolution of the parties' motions has been included in this section.

Elmhurst, Illinois. (Plaintiff's 56.1 Statement, (hereinafter, "Plf.'s 56.1"), ¶ 1.) Chamberlain manufactures and sells garage door opener systems ("GDOs"), including GDOs that utilize a "rolling code" technology, described in more detail below. (*Id.*) Defendant Skylink Technologies is a Canadian corporation with its principal place of business in Mississauga, Ontario. (*Id.* ¶ 2.) Skylink Technologies distributes and markets components of GDOs in the United States.[3]

The dispute before the court relates to a relatively new line of GDOs manufactured and distributed by Chamberlain, called the "Security+" line. This line of GDOs differs from other models in that it incorporates a copyrighted computer program that constantly changes the transmitted signal needed to actuate the garage door. Both sides refer to this feature as "rolling code."

Chamberlain objects to Skylink's development of a new universal transmitter, the Model 39 universal transmitter, that can be used with a number of GDOs, including Chamberlain's Security+ GDO. Skylink's universal transmitter is compatible with Chamberlain's Security+ line and permits the user of the Skylink transmitter to open a Chamberlain Security+ door even though Skylink's product does not use a rolling code. Skylink's marketing of its transmitter, according to Chamberlain, leaves the Security+ GDO susceptible to those who would seek to record the signal of the Model 39 transmitter and then play it back in order to illegally gain access to a homeowner's garage. By creating a transmitter that circumvents Chamberlain's rolling code protective measure, Plaintiff contends, Skylink has violated the DMCA, 17 U.S.C. § 1201, *et seq.*

A number of facts relevant to this case are disputed. Most significantly, the parties disagree as to the purpose behind Chamberlain's rolling code GDO and the methodology of Skylink's Model 39 transmitter. The court will first set forth the technology and purpose behind Chamberlain's rolling code computer program before describing Skylink's universal transmitter.

---

[3]     Both sides agree that this court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a). In addition, both sides agree that venue is proper in this district pursuant to 28 U.S.C. § 1391.

**Garage Door Openers**

Chamberlain manufactures and markets a variety of GDOs. (Plf.'s 56.1 ¶ 1.) A GDO typically consists of a hand-held portable transmitter and a garage door opening device, which includes a receiver with a processing unit and a motor to open or close the user's garage door.[4] (*Id.* ¶ 5.) In order to open or close the garage door, the user presses a button located on the transmitter, which in turn sends a radio frequency (RF) signal to the receiver located on the garage door opening device, which is attached to the garage ceiling. (*Id.*) Once this signal is received, the receiver relays that signal to the processing unit that directs the motor to open or close the garage door. (*Id.*) In order to prevent foreign or unauthorized transmitters from operating a homeowner's garage door, GDOs often utilize unique codes that link a transmitter to its own GDO system. (*Id.* ¶ 6.) As a result, the opening device must recognize the unique transmitter signal before activating the garage door motor. (*Id.*)

The code in the standard GDO transmitter is unique but fixed. Thus, according to Chamberlain, the typical GDO is vulnerable to attack by burglars who can open the garage door by utilizing a device referred to by Plaintiff as a "code grabber." (Declaration of James J. Fitzgibbon, (hereinafter, "Fitzgibbon Decl."), Ex. C to Plf.'s Memorandum, ¶ 7.) James Fitzgibbon, an electrical engineer for Plaintiff, explained that a "code grabber" allows a burglar to capture and record a coded RF signal as it is transmitted by a transmitter. (*Id.*) In order for a code grabber to successfully record a transmitted signal, the burglar must be physically present with his or her code

---

[4]    In support of this description of a standard GDO, Plaintiff has cited *Overhead Door Corp. v. Chamberlain Group, Inc.*, 194 F.3d 1261, 1264 (Fed. Cir. 1999). Defendant objects to Plaintiff's reliance on *Overhead Door*, claiming that the factual findings in that case are not binding on this court. (Defendant's Response to Plf.'s 56.1, (hereinafter, "Def.'s Resp."), ¶ 5.) The court agrees. The court in *Overhead Door* was addressing infringement claims related to certain patents held by Chamberlain, which are not relevant to Chamberlain's motion here. Although Defendant objects to the court's reliance on *Overhead Door*, there is no dispute concerning the accuracy of that court's description of GDO components.

grabber when the home owner is using the transmitter.[5] Fitzgibbon explains that the burglar can then return at a later time, play back the RF recorded on the code grabber, and illegally obtain access to the homeowner's garage. (*Id.*)

Skylink disputes that code grabbing is a genuine problem and cites the testimony of Chamberlain's own witnesses. Fitzgibbon himself acknowledged he had no first hand knowledge of any instances of a code grabber being used to access a homeowner's garage. (Fitzgibbon Deposition, (hereinafter "Fitzgibbon Dep."), Ex. 2 to Declaration of Peter T. Christensen, at 36-37; *see* Def.'s Resp. ¶ 7.) Richard Allan Gregory, Chamberlain's national sales representative, retail products group, also testified that he has no personal knowledge of the use of code grabbers and does not have any data demonstrating that code grabbing is a problem. (Gregory Deposition, (hereinafter, "Gregory Dep."), Ex. 1 to Declaration of Peter T. Christensen, at 9, 120-125.) Fitzgibbon did use a code grabber himself, however, to determine that the signal transmitted by Skylink's Model 39 transmitter (the subject of this lawsuit) could be recorded and replayed to activate Chamberlain's rolling code GDO. (Fitzgibbon Decl. ¶16.)

Regardless of whether code-grabbing is a genuine problem for consumers, Chamberlain claims that it developed a "rolling code system" to address the problem. (Fitzgibbon Decl. ¶¶ 3, 4.) According to Chamberlain, its rolling code system will prevent a code grabber from gaining access to the garage because a component of the transmission code is always changing, so that a previously recorded signal will not activate the Chamberlain rolling code GDO. (*Id.*) Chamberlain uses a computer program in both the transmitter and the receiver of the GDO that constantly alters the code needed to actuate the garage door by using programs referred to as "rolling code" and marketed as the "Security+" line by Chamberlain. (*Id.* ¶ 4.) Chamberlain has a copyright on both computer programs used in its Security+ or rolling code GDOs; the transmitter computer program

---

[5]      Chamberlain does not explain how close the burglar and code grabber need to be to the transmitter to successfully record the transmitted signal.

is registered with the United States Copyright Office as No. TX5-533-065, (Certificate of Registration for Copyright No. TX5-533-065, Ex. A to Plf.'s Memorandum in Support of Summary Judgment), and the computer program in the receiver is registered with the United States Copyright Office as No. TX5-549-995, (Certificate of Registration of Copyright No. TX5-549-995, Ex. B to Plf.'s Memorandum in Support of Summary Judgment).

**Operation of Chamberlain's Rolling Code Program**

Unlike a typical GDO, the computer program in Chamberlain's Security+ transmitter transmits a digital encoded signal that has two components: (1) a unique fixed identification number (similar to those used in a standard GDO) and (2) a variable number ("rolling code"). (Fitzgibbon Decl. ¶ 3.) Both the identification code and the rolling code are represented by binary digits sent from the transmitter. (*Id.*) The fixed identification code remains the same, but the rolling code component changes by a factor of three every time the user presses the button on the transmitter. (*Id.*)

Before this signal is capable of activating a user's GDO, the code must first be programmed into the receiver of the rolling code GDO. After switching the Chamberlain GDO into the program mode, which can be done at any time during the life of the GDO, the user must press the transmitter button, at which time the fixed and rolling code are stored by the computer program in the receiver. (*Id.* ¶ 4.) The user then switches the Chamberlain GDO back into operate mode from which he can use his transmitter to remotely activate the garage door. (*Id.* ¶ 6.) When the programmed transmitter is next used, the computer program in the transmitter causes the identification code to be sent with the next rolling code in sequence (that is, the last rolling code increased by a factor of three) to the receiver. (*Id.*)

When the signal from the transmitter reaches the receiver, a computer program in the operating device determines whether the newly-received rolling code is identical to a previously-

6

received rolling code or within the previous 1,024 values (the "rear window"). (*Id.*) If the newly-received rolling code falls within the "rear window," the rolling code computer program in the receiver will not operate the GDO. (*Id.*) If the newly-received code's rolling code is one of the 4,096 values in advance of the previously-received rolling code (the "forward window"), the computer program accepts the new rolling code and operates the GDO. (*Id.*) Specifically, once an appropriate rolling code is received, the rolling code computer program in the receiver sends instructions to the microprocessor to operate the GDO. (*Id.*) This feature of the rolling code GDOs, according to Chamberlain, prevents code grabbers from gaining access to the garage because when a recorded code is replayed, the rolling code transmitted by the code grabber would most likely be in the rear window and would not operate the Chamberlain GDO. (*Id.*)

According to Chamberlain, the copyrighted rolling code computer program in the Security+ GDO deciphers and verifies whether the rolling code is valid and then, if it is, the program activates the motor that operates the garage door. Chamberlain characterizes that portion of the computer program that verifies the rolling code as a protective measure that controls access to Chamberlain's copyrighted computer program in its Security+ GDOs. (*Id.* ¶¶ 6, 7.) In other words, Chamberlain claims that the rolling code computer program has a protective measure that protects itself. Thus, only one computer program is at work here, but it has two functions: (1) to verify the rolling code and (2) once the rolling code is verified, to activate the GDO motor, by sending instructions to a microprocessor in the GDO.

Chamberlain describes the software as addressing rolling code values in the "forward window," (the 4,096 values after the previously-received rolling code) and the "rear window," (the 1,024 codes preceding the previously-sent rolling code). The "forward window" is a large one (i.e., it contains hundreds of codes) to allow for the possibility that the user may occasionally or even frequently depress the transmitter button while still outside the range of the GDO receiver. Pressing the button will cause the code to advance, but even when the user does so dozens of

times, the code will not move outside the "forward window." The court notes, however, that there are additional values recognized by the software that are outside the scope of both windows: When a transmitter relays a signal outside of either window, the rolling code software performs a readjustment process that in certain circumstances will allow the user to access his or her garage despite the fact that the rolling code value falls outside the forward window. (*Id.* ¶ 11.) When the receiver receives a rolling code that is both outside the forward window and the rear window, the user will be unable to access his or her garage with the first press of the transmitter button, but can gain access by immediately pressing the transmitter button a second time, while the GDO remains in the operate mode. (*Id.* ¶ 12.) Upon receiving the second code, the computer program considers the two codes together to determine whether the two rolling codes are separated by a factor of three. (*Id.*) If the sequence is proper, the rolling code computer program will treat the combination as a valid rolling code transmission. This process is called "resynchronization" and was included, according to Chamberlain, to address the possibility that a user may press the transmitter button so many times while out of range that the rolling code will exceed the last number in the forward window the next time the user is in range of the rolling code GDO. (*Id.*)

Skylink disputes a number of Chamberlain's assertions. First, although Skylink acknowledges that Chamberlain implemented a rolling code technique in its "Security+" brand GDOs, Skylink disputes that Chamberlain's "Security+" GDOs actually use the copyrighted software described above. In support of this assertion, Skylink again cites the deposition of James Fitzgibbon, who testified that the software copyrighted by Chamberlain as numbers TX5-533-065 and TX5-549-995 is not the exact software used in the current rolling code GDOs. (Fitzgibbon Dep., at 23-24.) Fitzgibbon also noted that there is a new version used in the current Security+ GDO and that the rolling code software is "always a work in progress." (*Id.* at 27, 183-84.)

Fitzgibbon explained that Chamberlain's copyrights were the starting point for the software used in the current rolling code GDOs and that the current computer program used in the rolling

code GDOs is a derivative work of the two copyrights identified above. (*Id.* at 23-24) Fitzgibbon stated later in a supplemental declaration that:

> All versions of the software contained in Chamberlain rolling code GDO sold from 1996 to the present have the same rolling code functionality as the software contained in Chamberlain's copyrighted registrations. The differences in the various updated versions relate only to minor changes up to 2001, a rewriting of the software to operate with a Microchip microcontroller, and minor changes on the Microchip-compatible software since 2001.

(Fitzgibbon Supplemental Declaration, (hereinafter, "Fitzgibbon Suppl. Decl."), ¶ 8.)

Skylink's second factual challenge relates to discovery: Skylink asserts it is unable to respond fully to Chamberlain's claims regarding the rolling code computer program because Chamberlain withheld information regarding the program. (Declaration of Peter T. Christensen ¶ 6.) Specifically, according to Peter T. Christensen, one of Skylink's attorneys, Chamberlain has failed to provide: "(i) the source code for each computer program actually used in its GDOs, (ii) electronic copies of each computer program actually used in its GDOs, (iii) schematics for or summaries of each computer program actually used in its GDOs, or (iv) information regarding the authorship or ownership of each computer program actually used in its GDOs." (*Id.*) As a result, Defendant claims that it unable to determine whether the software used in the Security+ GDO is properly copyrightable, or whether it is owned by or properly licensed to Chamberlain. (*Id.*)

Chamberlain insists it has provided the relevant information for the copyright-registered version of the computer program. (Certificate of Registration for Copyright No. TX5-533-065, Ex. A to Plf.'s Memorandum in Support of Summary Judgment; Certificate of Registration of Copyright No. TX5-549-995, Ex. B to Plf.'s Memorandum in Support of Summary Judgment.) Chamberlain claims, further, that the receivers for Chamberlain's rolling code GDOs "sold through 2001 used this [copyrighted] version as well as derivative works having insubstantial differences with respect to rolling code operation." (Supp. Decl. of James Fitzgibbon ¶ 8.) Chamberlain also claims to have provided all versions of the rolling code computer program with its reply memorandum in

support of its summary judgment motion. (Plf.'s Reply Memorandum in Support of Summary Judgment, at 6 n.7.)[6]

Skylink's third factual challenge is to Chamberlain's assertion that its rolling code software prevents burglars from code grabbing and illegally accessing Chamberlain GDOs. Skylink notes that Plaintiff is unable to demonstrate that code grabbing is a problem and in fact lacks evidence that code grabbing occurs at all. In any event, Skylink contends, Chamberlain's rolling code technology does not actually prevent code grabbing. In support of this assertion, Plaintiff again cites the deposition of Fitzgibbon, in which Fitzgibbon stated that under certain circumstances a code grabber could still illegally access the Chamberlain Security+ GDOs. (Fitzgibbon Dep., at 44-46, 132-33.) Fitzgibbon explained that it is theoretically possible, through the resynching process, for a code grabber to record two transmissions in order and then play back these signals to gain access to the homeowner's garage. (*Id.* at 44-46.) Fitzgibbon explained, however, that this replaying would have to involve two rolling codes that are in exact numerical order and not in the "rear window."[7] (*Id.*)

Lastly, Skylink maintains that the true purpose for implementing the rolling code computer program into the Security+ GDOs was to prevent signals from overhead planes from inadvertently activating Chamberlain GDOs. This assertion is supported by Dan Kaye, Chamberlain's Midwest regional sales manager, who stated that the rolling code technology was introduced because users were bothered by planes flying overhead and inadvertently activating the Chamberlain GDO. (Kaye

---

[6]     The court infers from this assertion that Chamberlain concedes it did not furnish the source code and relevant information for the computer program actually used in the Security+ GDOs now sold by Chamberlain prior to filing its reply.

[7]     Fitzgibbon also explained that it is possible for a code grabber to steal the transmitter, record two signals in exact order, and then return to the GDO to illegally enter by using the previously recorded codes. (*Id.* at 132-33.) The court notes, however, that a burglar who has stolen the transmitter would not need to bother recording signals at all; he could simply use the stolen device to access the garage.

Dep., at 16-19.) Kaye concluded that the rolling code GDOs were developed in response to customer complaints and requests for a solution around the time the rolling code technology was developed. (*Id.* at 19.) Kaye testified that he was not aware of any conversations at Chamberlain regarding this problem, however. (*Id.*) In fact, Kaye testified that he was not certain that planes flying overhead actually activated the GDOs, only that his customers complained about it. (*Id.* at 17.)

**Skylink's Model 39 Transmitter**

Both sides agree that "universal GDO transmitters" are marketed and sold to consumers as either replacements or as additional transmitters. (Def.'s 56.1 Statement of Additional Fact, (hereinafter, "Def.'s 56.1"), ¶ 55). Universal transmitters are manufactured by one company, but will work with a number of GDO brands, even if that GDO is manufactured by a different company. (*Id.* ¶¶ 55, 57.) Both parties agree, further, that Skylink and Chamberlain are the only significant distributors of universal GDO transmitters. (*Id.* ¶ 60.) Chamberlain manufactures and produces a universal transmitter called the "Clicker," which will work with Chamberlain GDOs as well as GDOs manufactured by other companies that do not utilize a rolling code system. (*Id.* ¶¶ 56, 57.) The Clicker also works with the Chamberlain rolling code GDO in the same manner as the original transmitter, utilizing the rolling code computer program. (*Id.*)

Both sides agree that Chamberlain does not place any restrictions on consumers regarding the type of transmitter they must buy to operate a Chamberlain rolling code GDO. (*Id.* ¶ 48.) In other words, Chamberlain does not advise consumers that they are limited to purchasing Clicker transmitters for any additional or replacement transmitters.

Skylink has been marketing and selling universal transmitters since 1992 (*id.* ¶ 58), but it did not distribute the transmitter at issue here, the Skylink Model 39, until August 2002. (*Id.* ¶ 64.) Both sides agree that the Model 39 transmitter was designed to allow the transmitter to function

11

with common GDOs, including both rolling code and non-rolling code GDOs. (*Id.* ¶¶ 67, 71.) Specifically, the Model 39 transmitter can function with at least 15 different brands and "dozens of different GDO models," only a few of which include Chamberlain's rolling code computer program. (*Id.* ¶ 77.) Although Chamberlain does not dispute that the Model 39 transmitter is capable of operating many different GDOs, it nevertheless asserts that Skylink markets the Model 39 transmitter for use in circumventing its rolling code computer program. (Chamberlain's Reply to Def.'s 56.1 ¶ 84.) In support, Chamberlain points out that the Model 39 has one specific setting that operates Chamberlain's rolling code GDOs and not any other brand. (Model 39 operating instructions, Ex. 2 to Plf.'s Memorandum in Support, at ¶ 2b & Chart 2).

It is undisputed by the parties that before a Model 39 transmitter can be used to open a Security+ GDO, the user must first store the Model 39 transmitter signal into the GDO's memory. (Def.'s 56.1 ¶ 78.) Although the parties have not described the storing process for the Model 39 into the rolling code GDO, the court presumes, for the purposes of this motion, that the process is similar to the one that the user follows when storing a Chamberlain or Clicker transmitter signal into memory.

Philip Tsui, chief executive officer of Skylink, claims that the Model 39 transmitter and the accompanying software were independently developed and that Skylink did not copy the rolling code software to create the Model 39 transmitter. (Declaration of Philip Tsui, (hereinafter, "Tsui Decl."), ¶ 4.) James Fitzgibbon, Chamberlain's engineer, stated in his own declaration that the Skylink transmitter does not use a rolling code. (Fitzgibbon Decl. ¶ 11.) Chamberlain nevertheless disputes Skylink's assertion that it developed its software independently. The court notes that Tsui testified that he did not play a part in designing the software.[8] (Tsui Deposition, Ex. 13 to

---

[8]     Tsui, who says he is "the most knowledgeable person at Skylink" regarding the Model 39 transmitter, states in his declaration that he "developed a method for operating rolling code GDOs without any copying of rolling code software," (Tsui Decl. ¶¶ 1,3), but the court
(continued...)

Chamberlain's Reply, at 30-31, 35, 39.) Chamberlain has not charged Skylink with copyright infringement or contributory infringement in developing and marketing the Model 39 software, however. (Def.'s 56.1 ¶ 69.)

Chamberlain, but not Skylink, devotes substantial attention to the operations of the Model 39 transmitter. According to Chamberlain, the Skylink Model 39 transmitter is able to activate the Chamberlain rolling code GDOs by "representing" the resynchronization process of Chamberlain's rolling code software. (Fitzgibbon Decl. ¶ 13.) The Model 39 transmitter does so, according to Chamberlain, by transmitting three fixed codes in a row with each press of the transmitter button. These fixed codes serve to "represent" the transmission of three rolling code transmissions. (Fitzgibbon Decl. ¶¶ 13-15.) The first of these three is arbitrarily set by Skylink; the second fixed code is minus 1800 values from the first code, and the third fixed code is plus 3 values from the second code. (Id.) The combination of these three codes with a press of the Model 39 transmitter button will either cause the Chamberlain GDO to operate in response to the first fixed code or cause the GDO to resynchronize and operate in response to the second and third fixed codes. (Id.)

This procedure, according to Chamberlain, circumvents Chamberlain's rolling code computer program, thereby eliminating the important protective measure that prevents burglars with code grabbers from gaining unauthorized access to Chamberlain's Security+ GDOs. (Id. ¶ 16.) According to Chamberlain, homeowners who purchase the Chamberlain GDO rely on the security of the rolling code technology and then unwittingly remove the security measure by purchasing and utilizing a Model 39 transmitter. (Id. ¶ 7.) By using the Model 39 transmitter, Chamberlain contends, homeowners are deprived of protection from the rolling code technology to prevent unauthorized access by such burglars. (Id.) Because the Model 39 transmitter mimics

---

[8](...continued)
disregards that statement to the extent it is inconsistent with Tsui's deposition testimony. (Tsui Dep. at 30-31, 35, 39.)

the resynchronization process with a series of three fixed codes, a code grabber would be able to record that transmission and play it back to illegally access a Chamberlain rolling code GDO.

**Chamberlain's Injuries**

Chamberlain's own universal transmitter, the "Clicker," has been commercially successful, amassing $20 million in sales from 1998 to 2002. (Gregory Decl. ¶ 4.) One of the major purchasers of Chamberlain's Clicker universal transmitter is Lowe's Home Improvement Warehouse ("Lowe's"), which in 2001 accounted for more than $1 million in net sales. (Id. ¶ 5.) Chamberlain claims that the marketing and distribution of the Model 39 transmitter has resulted in significant lost sales of Chamberlain's Clicker to Lowe's. (Id. ¶¶ 5, 6, 8, 10, 11.) Specifically, Chamberlain asserts that in July 2002, Dean Kochalka, the Lowe's merchandise manager for millwork products, informed Richard Allan Gregory, Chamberlain's national sales representative, that Lowe's was replacing the Clicker with Skylink's Model 39 transmitter. (Id. ¶ 10.) Chamberlain asserts, further, that Skylink began importing and selling the Model 39 transmitter to Lowe's as a means of circumventing Chamberlain's protective measures and gaining access to Chamberlain's copyrighted computer program. In support of this assertion, Chamberlain cites the packaging for the Model 39 transmitter, which states that the product is compatible with the "latest Rolling Code Technology", including Chamberlain's Security+ GDO. (Skylink Model 39 Universal Transmitter Package, Ex. E. to Plf's Memorandum in Support of Summary Judgment.) Skylink acknowledges selling the Model 39 transmitter to Lowe's, but claims its purpose in doing so was simply to provide a substitute or replacement universal transmitter to homeowners. (Def.'s Resp. ¶ 33; Tsui Decl. ¶¶ 6-12.)

In addition, Skylink claims that Lowe's stopped carrying the Clicker universal transmitter because of delivery problems and higher prices compared to that of other brands. (Gregory Dep., at 37-39.) Chamberlain agrees that some of its GDO products were no longer carried by Lowe's

14

because of price and late shipments, but points out that, as Richard Gregory testified, this decision did not include the Clicker universal transmitters. (*Id.* at 39.) Essentially, according to Gregory, there were two different instances in which Lowe's decided not to carry certain Chamberlain products. The first instance took place in January of 2002, when Lowe's decided to stop carrying Chamberlain GDOs in favor of other brands. (*Id.* at 37-38.) This decision did not impact the Clicker universal transmitter, which Lowe's continued to carry at its stores. (*Id.*) Chamberlain asserts that Lowe's did stop carrying Clicker transmitters a few months later because Skylink developed a universal transmitter that worked with rolling code GDOs and sold at a lower price than Chamberlain's Clicker universal transmitter; but the only evidence Chamberlain cites for this assertion is hearsay. (*Id.* at 39-40.) In any event, the court does not believe this statement, if admissible, would establish that Chamberlain is entitled to summary judgment.

For the purposes of this motion, both sides agree that although Skylink has marketed its Model 39 to at least one other retailer as capable of operating Chamberlain's rolling code GDOs, Chamberlain did not lose sales to any seller, other than Lowe's, because of Skylink's product. (Def.'s 56.1 ¶ 86; Gregory Decl. ¶ 12.)

## DISCUSSION

### I.    Summary Judgment Standard

Summary judgment is warranted where "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *Becton Dickinson and Co. v. C.R. Bard, Inc.,* 922 F.2d 792, 795 (Fed. Cir.1990); *Southwall Technologies, Inc. v. Cardinal IG Co.,* 54 F.3d 1570, 1575 (Fed. Cir.1995). Material facts are those that might affect the lawsuit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The court will draw all reasonable factual inferences in favor of the non-moving party. *Id.* at 255. "For the grant of summary judgment there must be no material fact in dispute,

or no reasonable version of material fact upon which the nonmovant could prevail." *Brown v. 3M*, 265 F.3d 1349, 1351 (Fed. Cir. 2001). With these standards in mind, the court now addresses the parties' motions.

## II. The Digital Millennium Copyright Act

In moving for summary judgment, Plaintiff argues that the Skylink Model 39 Universal Transmitter violates the Digital Millennium Copyright Act (DMCA), 17 U.S.C. 1201(a)(2), because it illegally circumvents a protective measure (the rolling code) that controls access to its copyrighted computer program in Chamberlain's Security+ GDOs. Specifically, Chamberlain claims that Skylink has violated 17 U.S.C. § 1201(a)(2) of the DMCA, which states:

> (2) No person shall manufacture, import, offer to the public, provide, or otherwise traffic in any technology, product, service, device, component, or part thereof, that--
> (A) is primarily designed or produced for the purpose of circumventing a technological measure that effectively controls access to a work protected under this title;
> (B) has only limited commercially significant purpose or use other than to circumvent a technological measure that effectively controls access to a work protected under this title; or
> (C) is marketed by that person or another acting in concert with that person with that person's knowledge for use in circumventing a technological measure that effectively controls access to a work protected under this title.

(17 U.S.C. § 1201(a)(2)). As is clear from the statute itself, the DMCA prohibits any product that satisfies any one of the three bases of liability listed above. *RealNetworks, Inc. v. Streambox, Inc.*, No. 2:99CV02070, 2000 WL 127311, *7 (W.D. Wash. 2000); *Sony Computer Entm't Am., Inc. v. Gamemasters*, 87 F. Supp. 2d. 976, 987 (N.D. Cal. 1999). The DMCA also provides definitions for certain terms relevant to all three bases of liability listed above:

> (A) to "circumvent a technological measure" means to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner; and
> (B) a technological measure "effectively controls access to a work" if the measure, in the ordinary course of its operation, requires the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work.

17 U.S.C. § 1201(a)(3)(A), (B).

The DMCA was enacted in 1998 to implement the World Intellectual Property Organization Copyright Treaty and serves as an means to better protect copyright in the digital age. *Universal City Studio, Inc. v. Corley*, 273 F.3d 429, 440 (2d Cir. 2001). In passing the DMCA, Congress specifically addressed the protection of copyrighted material transmitted over the Internet:

> The digital environment now allows users of electronic media to send and retrieve perfect reproductions of copyrighted material easily and nearly instantaneously, to or from locations around the world. With this evolution in technology, the law must adapt in order to make digital networks safe places to disseminate and exploit copyrighted works.

H.R. REP. No. 105-551, Part 1, 105th Cong., 2d Sess. (1998). In *Universal City Studios,* the Second Circuit affirmed an injunction in favor of motion picture studios against the owners of Internet web sites who had posted and permitted downloading of computer software that decrypted digitally encrypted movies on DVDs. Our own Court of Appeals affirmed an injunction that effectively shut down the "Aimster" Internet service from facilitating the swapping of digital copies of popular music, most of it copyrighted, over the Internet. *In re Aimster Copyright Litigation*, 334 F.3d 643 (7th Cir. 2003). In *Pearl Investments, LLC v. Standard I/O, Inc.*, 257 F. Supp. 2d 326, 350 (D. Me. 2003), the court found a genuine issue of material fact regarding whether or not defendant Jesse Chunn had violated the DMCA by circumventing the "protections of Pearl's encrypted, password-protected virtual private network . . . to gain access to" software programs that plaintiff used in operating an automated stock-trading system. *Id.* In re *Verizon Internet Services, Inc.*, 257 F. Supp. 2d 244, 275 (D.D.C. 2003), was an Internet service provider's unsuccessful challenge to the constitutionality of subpoena power established by the DMCA, exercised in that case by the Recording Industry Association of America to obtain the name of a Verizon user who infringed copyrights by permitting others to download hundreds of copyrighted songs from the Internet.

It is undisputed that the DMCA's application is not limited to the Internet, however. *See*

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 253 F. Supp. 2d 943, 966-67 (E.D. Ky. 2003) ("[t]he DMCA was enacted to prohibit, *inter alia*, the trafficking of products or devices that circumvent the technological measures used by copyright owners to restrict access to their copyrighted works."). In *Lexmark*, the court granted a preliminary injunction in favor of Lexmark to prevent Defendant Static Control Components from marketing a computer chip it developed to circumvent Lexmark's "authentication sequence" that insures that a Lexmark printer is used with a Lexmark toner cartridge. *Id.* at 952. This authentication sequence is carried out by a computer program contained in a microchip on the toner cartridge and a program in the laser printer. *Id.* at 952. If the sequence is not done properly, the laser printer will not allow the toner cartridge to access and operate the copyrighted computer programs, which control the various functions of the laser printer. *Id.* Defendant developed a "SMARTEK" computer chip that allows an "unauthorized" toner cartridge to circumvent the authentication sequence and in turn, access the copyrighted computer programs that operate the Lexmark laser printer. *Id.* at 955. The district court granted a preliminary injunction, finding that Lexmark demonstrated a likelihood of success on all three bases of liability under Section 1201(a)(2). *Id.* at 974; *see also Static Control Components, Inc. v. Dallas Semiconductor Corp., et al.*, 2003 WL 21666582 (M.D.N.C. July 16, 2003) (declaratory judgment action on same dispute as in *Lexmark*).

Chamberlain insists that the plain language of the Act shows that it applies here, as well. According to Chamberlain, the rolling code computer program is a technological measure that "effectively controls access to a work," and the Model 39 transmitter circumvents this technological measure. Chamberlain maintains that the rolling code component of its copyrighted software protects access to the portion of the software that actuates the GDO. Thus, Chamberlain argues, the Model 39 transmitter circumvents the rolling code protective measure to gain access to the copyrighted software necessary to operate its GDO.

Chamberlain argues that the Model 39 transmitter violates the Act in all three ways

described under 17 U.S.C. § 1201(a)(2). Chamberlain believes the Model 39 transmitter violates section 1201(a)(2)(A) because the transmitter is primarily designed to circumvent the protective measure to gain access to Chamberlain's copyrighted computer program. Chamberlain claims that the transmitter violates Section 1201(a)(2)(B) because the transmitter has only limited commercial purpose or use other than for circumvention of Chamberlain's rolling code GDO. Lastly, Chamberlain argues that Skylink's Model 39 violates Section 1201(a)(2)(C) because the product is marketed for circumvention of Chamberlain's rolling code computer program.

Skylink responds by raising a number of arguments in opposition to Chamberlain's summary judgment motion, including that: (1) the Model 39 transmitter serves a variety of functions that are unrelated to circumvention; (2) Chamberlain has failed to demonstrate that its GDOs contain a computer program protected by copyright; (3) consumers use the Model 39 transmitter to activate the Security+ GDOs with Chamberlain's consent; (4) Skylink has not violated the DMCA because it falls within a safe harbor provision of the Act; and (5) Chamberlain's rolling code computer program does not protect a copyrighted computer program, but instead protects an uncopyrightable process.

Some of the issues raised here appear to be matters of first impression in this Circuit. As noted, the Seventh Circuit did address the Act in *In re Aimster Copyright Litig.*, 334 F.3d 643 (7th Cir. 2003), but the dispute in that case involved certain safe harbor provisions of the DMCA that are not raised here. The *Aimster* court did not examine Section 1201(a)(2)(A) of the Act, which is at issue in this case.

**The Purpose of the Skylink Model 39 Transmitter**

Skylink argues, first, that it is not liable under the DMCA sections 1201(a)(2)(A) and (B) because its product is not produced for the sole purpose of operating Chamberlain's rolling code GDOs. Instead, Skylink argues, the Model 39 transmitter operates a variety of GDO brands, which

including both rolling code GDOs and non-rolling code GDOs. Chamberlain acknowledges that the Model 39 transmitter can operate GDOs other than Chamberlain's rolling code models. Chamberlain points out, however, that the transmitter has one setting that has no purpose other than operating the Security+ GDOs. This feature by itself establishes Skylink's liability under the DMCA, in Chamberlain's view. Notably, both sides rely on *Universal City Studios, Inc. v. Reimerdes*, 111 F. Supp. 2d 294, 319 (S.D.N.Y. 2000), *aff'd Universal City Studios v. Corley*, 273 F.3d 429 (2d Cir. 2001)[9], and *RealNetworks, Inc. v. Streambox, Inc.*, No. 2:99CV02070, 2000 WL 127311 (W.D. Wash. 2000), in support of their arguments.

In *Reimerdes*, plaintiff, a group of motion picture studios, sought an injunction under the DMCA to prohibit illegal copying of digital versatile disks (DVDs). 111 F. Supp. 2d at 308. Plaintiff presented evidence that each motion picture DVD includes a content scrambling system (CSS) that permits the film to be played, but not copied, using DVD players that have plaintiff's licensed decryption technology. *Id.* Defendant, a computer hacker, provided a link on his website which allows an individual to download "DeCSS," a software program that allows the user to circumvent the CSS protective system and view or copy a motion picture from a DVD, regardless of whether or not the user has a DVD player with the licensed technology. *Id.* The court found that defendant had violated 17 U.S.C. § 1201(a)(2)(A) because the DeCSS software had only one purpose: to decrypt CSS. *Id.* at 319, 346.

In addition, both sides cite *RealNetworks, Inc.*, in which the plaintiff obtained a preliminary injunction under the DMCA, barring defendant from manufacturing and selling one of its own products, the Streambox VCR. 2000 WL 127311, at *1. Plaintiff RealNetworks markets a software

---

[9]     The court notes that the district court's decision in *Universal City Studios* was later affirmed by the Second Circuit Court of Appeals in *Universal City Studios v. Corley*, 273 F.3d 429 (2d. Cir. 2001). Both sides here rely on the district court's decision in this case, rather than the Second Circuit's decision, presumably because the district court, but not the Court of Appeals, addressed Section 1201(a)(2)(A).

product that allows the owners of audio and visual content to send this information *over the Internet*, but at the same time prevent the end user from copying these copyrighted materials. *Id.* Specifically, plaintiff developed a method to "stream" an audio or visual clip to an end user, which means that the clip is sent to the consumer, but no trace of the clip is left on the user's computer and the user is prevented from downloading the streamed clip. *Id.* at *2. Plaintiff adopted two protective measures to insure that the clips are not downloaded or copied by an end user without the owner's permission. *Id.* The first security measure is the "Secret Handshake," an authentication sequence which insures that RealNetwork clips are only sent to computers with RealPlayer software, a software program developed by RealNetwork. *Id.* In addition, each of the clips sent from a RealNetwork's server has a "Copy Switch," a piece of data in each clip, allowing the owner of the clip to decide whether a user is permitted to copy or download the clip. *Id.* The RealPlayer software contained on the user's computer will read this piece of data and respect the owner's preference. *Id.*

Defendant Streambox developed a product called the Streambox VCR that permits its users to access and download material located on the RealNetwork servers, despite the fact that the product does not run the RealPlayer software. *Id.* at *4. The Streambox VCR is able to access RealNetwork material by first mimicking the functions of the RealPlayer Software, or the "Secret Handshake" sequence, and then ignoring or circumventing the "Copy Switch," thereby enabling the user to copy clips with or without the owner's permission. *Id.* In this case, the Streambox VCR had some legitimate purposes that did not violate the DMCA, such as copying files that are freely available on various websites for downloading. The court nevertheless concluded that "a part of the Streambox VCR is primarily, if not exclusively, designed to circumvent the access control and copy protection measures that RealNetworks affords to copyright owners." *Id.* at *8. Thus, the court found that the basis for liability was met under 17 U.S.C. § 1201(a)(2)(A) and granted the plaintiff's request for a preliminary injunction. In addition, the court found that the basis for liability

was also met under Section 1201(a)(2)(B) because the "portion of the VCR that circumvents the Secret Handshake so as to avoid the Copy Switch has no significant commercial purpose other than to enable users to access and record protected content." *Id.* The court stated, moreover, that this portion of the VCR does not appear to have any additional commercial value.

Skylink argues that these cases demonstrate that Section 1201(a)(2)(A) and (B) only apply to products that have one purpose: decrypting or circumventing protective measures. In other words, according to Skylink, if the product serves any legitimate purpose, Section 1201(a)(2)(A) and (B) should not apply. In this court's view, however, both the cases described above and the plain language of the DMCA demonstrates the opposite. First, in *Reimerdes*, the court was presented with a straightforward case in which the only use of the accused product was to circumvent the protective measure, put in place by plaintiff, to protect its motion pictures from piracy. This holding does not establish that a product that has multiple purposes is exempt from the DMCA. Indeed, in the *RealNetworks* case, the court was presented with a product that had both a legitimate purpose and also functioned as a means to circumvent the plaintiff's protective measures. The *RealNetworks* court found that the portion of the product that circumvented the protective measure was enough to violate the DMCA.

The court notes, however, that Skylink has provided evidence that the Model 39 transmitter serves purposes other than circumventing. It is now Chamberlain's burden to establish that those other purposes do not prevent this court from finding the Model 39 in violation of the DMCA. For purposes of this decision, the court will assume that Chamberlain has done so. Like the Plaintiff in *RealNetworks*, Chamberlain has demonstrated that the Model 39 transmitter has one particular setting that serves only one function: to operate the Chamberlain rolling code GDO. Accordingly, the fact that the Model 39 transmitter serves more than one purpose may not be sufficient to deny summary judgment in this matter. The court therefore turns to certain other arguments raised by Defendant in opposition to Plaintiff's motion.

22

**Is the Rolling Code Computer Program Protected by Copyright?**

Skylink argues, next, that there is a disputed issue concerning whether Chamberlain's rolling code computer program is in fact protected by copyright. This issue is significant because section 1201(a)(2) of the DMCA states that a technological measure must "effectively control[] access to a work protected under this title." 17 U.S.C. 1201(a)(2). Accordingly, Chamberlain's computer program must be protected by copyright in order for the DMCA to apply to its computer program. Skylink argues that there are disputed issues of fact regarding whether the copyrighted version of the rolling code computer program is in fact the same program used in the Security+ GDOs and whether the actual computer program used in the Security+ GDOs is protected by copyright. Chamberlain notes that an original work need not be registered in order to enjoy copyright protection. See 17 U.S.C. § 102 ("Copyright protection subsists, in accordance with this title, in original works of authorship . . ."); *Montgomery v. Noga*, 168 F.3d 1282, 1288 (11th Cir. 1999) ("For original computer programs and other original works of authorship created after 1977, copyright automatically inheres in the work at the moment it is created without regard to whether it is ever registered.") Chamberlain observes, further, that copyright protection extends to derivative works, that is, to works based on one or more preexisting works. 17 U.S.C. §§ 101, 103. Thus, Chamberlain urges, the software in the Security+ device is protected because it is based on Chamberlain's copyrighted software.

Skylink points out that the copyrighted rolling code computer program is not the exact computer program used in the current Security+ GDOs. (Fitzgibbon Dep., at 23-24.) Skylink has not addressed Chamberlain's contention that its rolling code computer programs are protected as derivative works. The court notes, however, that Plaintiff did not supply the most recent version of the rolling code software until filing its reply brief for the purposes of this motion. (Reply Memorandum, at 6 n.7.) Although Fitzgibbon claimed that all of the computer programs have the

same "functionality" and are "derivative" works, the court is not willing to find that this establishes copyright protection when the Defendant has not had a sufficient opportunity to review the relevant computer program. As a result, the court finds that a disputed issue of fact exists regarding whether or not the current rolling code computer program is in fact protected by copyright.

**Does Model 39 Function without the Authorization of Chamberlain?**

Another dispute could serve as an independent basis for denial of the motion. Defendant contends that a question of fact exists regarding whether or not the consumer's use of the Model 39 transmitter with Chamberlain's rolling code GDOs is unauthorized for the purposes of the DMCA. To establish a violation of § 1201(a)(2) of the DMCA, a plaintiff must demonstrate that a defendant's product circumvents a technological measure. The DMCA explains that to "'circumvent a technological measure' means to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, *without the authority of the copyright owner.*" 17 U.S.C. § 1201(a)(3)(A) (emphasis added). As a result, in order for Skylink to be liable under any of the three bases, Chamberlain must demonstrate that the Model 39 transmitter provides unauthorized access to Chamberlain's software. *See* 17 U.S.C. § 1201(a)(2).

Skylink asserts that Chamberlain can not do so on these facts. Skylink observes that a homeowner who purchases a Chamberlain GDO owns it and has a right to use it to access his or her own garage. Before the transmitter is capable of operating the rolling code GDO, Skylink notes, the homeowner must program the Model 39 transmitter into the GDO. This demonstrates, Skylink urges, that the homeowner herself has authorized the use of the Model 39 transmitter. In addition, as Richard Allan Gregory explained, the packaging for the Security+ GDO does not include "any restrictions on a consumer's ability to buy a replacement transmitter or additional transmitter." (Gregory Dep., at 174-75.) Nor is there any other evidence that Chamberlain

24

instructs consumers that they are restricted to purchasing Chamberlain transmitters for use with the Chamberlain GDO.

Based on these facts, Skylink argues that consumers who purchase a Chamberlain GDO are free to purchase any after-market transmitter, whether or not it is manufactured by Chamberlain. Thus, those Chamberlain GDO consumers who purchase a Skylink transmitter are not accessing the GDO without the authority of Chamberlain, but instead, have the tacit permission of Chamberlain to purchase any brand of transmitter that will open their GDO.

In Chamberlain's view, this same argument was rejected in *Reimerdes*, where the court observed:

> Decryption or avoidance of an access control measure is not "circumvention" within the meaning of the statute unless it occurs "without the authority of the copyright owner." 17 U.S.C. §§ 1201(a)(3)(A). Defendants posit that purchasers of a DVD acquire the right "to perform all acts with it that are not exclusively granted to the copyright holder." Based on this premise, they argue that DeCSS does not circumvent CSS within the meaning of the statute because the Copyright Act does not grant the copyright holder the right to prohibit purchasers from decrypting. As the copyright holder has no statutory right to prohibit decryption, the argument goes, decryption cannot be understood as unlawful circumvention. Def. Post-Trial Mem. 10-13. The argument is pure sophistry. The DMCA proscribes trafficking in technology that decrypts or avoids an access control measure without the copyright holder consenting to the decryption or avoidance. *See* JUDICIARY COMM.REP. at 17-18 (fair use applies "where the access is authorized").

111 F. Supp. 2d at 317 n.137. Chamberlain believes this language resolves the user-authorization issue here, too, but the court disagrees. The district court in *Reimerdes* was looking at a set of facts quite distinct from those presented here: Plaintiff there had encoded its DVD's and licensed the software necessary to circumvent this encoding process to manufacturers of DVD players. As a result, the plaintiff in *Reimerdes* did in fact authorize certain circumvention of its technological protective measure pursuant to a license. It did not authorize circumvention by means of non-licensed software.

In this case, Plaintiff sells a GDO to a homeowner who then utilizes the product to access his or her own garage. As pointed out above, there are no limitations placed on the homeowner

who buys the Chamberlain rolling code GDO, regarding which type of replacement or additional transmitter he or she purchases to access the GDO. The court notes, further, that there is a history in the GDO industry of universal transmitters being marketed and sold to allow homeowners an alternative means to access any brand of GDO. (Def.'s 56.1 ¶¶ 55-58.) In fact, Chamberlain's own Clicker transmitter is capable of activating a variety of GDO brands. (*Id.* ¶ 57.) Furthermore, the homeowner has a legitimate expectation that he or she will be able to access the garage even if his transmitter is misplaced or malfunctions. During oral arguments on this motion, Plaintiff acknowledged that under its interpretation of DMCA, a garage owner violates the Act if he or she loses the transmitter that came with its Chamberlain rolling code GDO, but manages to operate the opener by somehow circumventing the rolling code. This court agrees with Defendant that the DMCA does not require such a conclusion.

Finally, the court notes its appreciation for *amicus* briefs filed by Consumers Union and by the Computer and Communications Industry Association (CCIA). Consumers Union argues that Chamberlain's interpretation of the DMCA as prohibiting after-market replacement transmitters would have the effect of stifling innovation and increasing consumer prices. A ruling in favor of Chamberlain on this motion, would, Consumers Union argues, leave consumers who own the Security+ product only one choice for an additional or replacement transmitter: the Chamberlain Clicker. CCIA argues that the court should deny summary judgment because Skylink's activities fall within § 1208(f) of the DMCA, which permits circumvention of a protective measure for the purpose of achieving interoperability. The court reaches neither of these arguments on this motion, but notes that for reasons identified by Skylink or by *amici*, Skylink itself may be entitled to summary judgment on Count III.

## CONCLUSION

The court concludes there are disputes of material fact concerning whether the computer

program in Chamberlain's rolling code is a work protected by copyright and whether the owner of

a Chamberlain rolling code GDO is authorized to use the Model 39 universal transmitter. Plaintiff's

motion for summary judgment on Count III is denied.

ENTER:

Dated: August 29, 2003

REBECCA R. PALLMEYER
United States District Judge